IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DARRES CHINSONG PARK,**

    **Plaintiff,**

v.                                                               **Civil Action No. 2:15cv42**
                                                            **(Judge Bailey)**

**UNITED STATES OF AMERICA,**

    **Defendant.**

### REPORT AND RECOMMENDATION

### I.    Procedural History

On June 8, 2015, the *pro se* Plaintiff initiated this case pursuant to the Federal Tort Claim Act. ECF No.1. The Plaintiff was granted leave to proceed *in forma pauperis* [ECF No. 6], and on June 26, 2015, he paid the initial partial filing fee. ECF No. 9. On November 13, 2015, the undersigned issued a Report and Recommendation that the case be dismissed as time barred. ECF No. 20. On November 30, 2015, the Court declined to adopt the Report and Recommendation because the Plaintiff had previously filed an identical complaint which was timely but was dismissed because it was not tendered on the court-approved form. Accordingly, the Court ordered that the action be allowed to proceed. ECF No. 23.

On December 4, 2015, the undersigned completed a preliminary review of the complaint and determined that summary dismissal was not appropriate. Therefor an Order to Answer was entered. ECF No. 26. On March 9, 2016, Defendant filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment. ECF No. 40. On March 15, 2016, a <u>Roseboro</u> Notice was issued [ECF No. 44], and on April 14, 2016, Plaintiff filed a response. ECF No. 48.

## II. The Pleadings

### A. The Complaint

Plaintiff maintains that he was assaulted and stabbed multiple times on February 20, 2013, at USP Hazelton by several Sureno gang members. He maintains that his injuries included a hemo-pneumothorax, laceration of his left arm, right knee ligament tear, right shoulder separation, and a broken finger. Plaintiff also maintains that he suffers from mental issues including anxiety, hyper-vigilance, nightmares, and post-traumatic stress disorder.

Plaintiff alleges that the attack was the result of his saving a BOP staff member from serious assault by a Sureno gang member on March 22, 2011, at a previous federal prison. Plaintiff further alleges that is well known by BOP employees that intervention such as his results in that inmate becoming a both a target and a pariah by his peers, particularly at a high security prisons. Despite this "knowledge," Plaintiff alleges that following the March 22, 2011 incident, he was repeatedly placed in high security prisons alongside Sureno gang members.

Within his complaint, Plaintiff sets forth a series of "incidents" which he believes demonstrate that BOP officials routinely ignored the potential for violence against him at the hands of Sureno gang members. More specifically, Plaintiff sets forth a lengthy history of his placement at USP Lee[1], where he maintains he expressed concerns during the initial screening process regarding placement in the general population. Plaintiff further maintains that despite documentation in his central file, he was told that he was not in danger. He contends, however, that on March 29, 2012, he was surrounded by Sureno gang members and given the choice between physical harm and monetary payments for protection. Plaintiff alleges that in accordance with BOP policy, he requested a threat assessment on March 30, 2012, and was placed in the Special Housing Unit ("SHU") pending

---

[1]Plaintiff does not indicate when he arrived at USP Lee. However, Defendant indicates that the transfer occurred on January 7, 2012. ECF No. 41-1 t 16.

investigation. Plaintiff maintains that he never was interviewed by special investigation services or any other staff member, and on April 23, 2012, was ordered to return to general population. Plaintiff maintains he refused and was issued a disciplinary report.  Following the appeal process, Petitioner maintains that the incident report was expunged by the regional director. Eventually, according to Plaintiff, he was granted an interview with the acting SHU lieutenant and was granted protective custody which immediately separated him from all Sureno members.[2]

On October 9, 2012, Plaintiff was designated to USP Hazelton.  Plaintiff maintains that this designation was made despite the fact that his central inmate monitoring packet was not completed. Plaintiff indicates that he arrived at USP Hazelton on January 13, 2013, and during the initial screening he notified staff that the very real possibility of grave physical harm loomed if he was placed in general population with Sureno gang members. Plaintiff alleges that was told that no threat existed and any refusal to enter general population would result in additional incident reports and placement in the SHU for a minimum of eighteen months. Plaintiff immediately entered general population. Plaintiff alleges that on January 19, 2013, during initial team meeting, he informed his case manager of concerns regarding his safety, and the free flow of information through non formal channels by staff to inmates regarding confidential information about other inmates.  Less than one month later, on February 20, 2013, Plaintiff was assaulted and stabbed.

 A. **Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment**

Defendant argues that Plaintiff's complaint must be dismissed in its entirety. In support of this position, Defendant contend that the BOP's decisions regarding the transfer of the Plaintiff from USP Lee to USP Hazelton, is protected by the discretionary function exception to the FTCA.

---

[2]Although Plaintiff references his Exhibit 18 {ECF No. 18-14] as support for this statement, a review of the exhibit confirms only that his incident report was expunged.  No exhibit of record establishes that Plaintiff was ever made a separatee from the Surenos gang as a whole.

3

Defendant contends that in his initial screening at USP Hazelton, Plaintiff did not indicate that he could not be placed in general population. ECF No. 41-1 at 25. However, Defendant acknowledges that on February 20, 2013, staff observed Plaintiff being attacked by seven other inmates, including being stabbed in the upper torso area. In addition, Defendant acknowledges that a subsequent investigation indicated that the attackers had information that Plaintiff had an award "for saving a Staff Member's life from an attack by a Sureno Gang Member." ECF No. 41-1 at 6. Defendant contends that Plaintiff was separated from every individual who was a verified threat to him, but the BOP is not mandated to separate an inmate from an entire gang or gang affiliate or other group of persons, nor should it be. Defendant asserts that the BOP must weigh multiple factors in making these decisions and use their discretion in protecting the safety and security of the inmates, as well as the institutions they manage. Finally, Defendant argues that Plaintiff bears "the burden of proof to show an unequivocal waiver of sovereign immunity exists and to show that" the discretionary function exception does not apply." LeRose v. United States, 285 F. App'x 93, 96; Welch v. United States, 409 F.3d 646 (4th Cir.2005). Defendant alleges Plaintiff cannot meet this burden and, therefore, his complaint must be dismissed.

B. **Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss**

Plaintiff argues that there are genuine issues of material fact that preclude summary judgment on his claim for negligence and failure to protect. Plaintiff refers to the BOP Inmate Information Handbook and maintains that he followed the policy as directed by immediately reporting being confronted by Sureno members on March 30, 2012. Plaintiff further argues that to suggest that after years of incarceration he was not aware of the dire consequences of assisting a correctional is "non-sensical." In addition, Plaintiff notes that Case Manager Gyurke admits in his declaration that

4

he was given documents intended for the Warden which state that he had assisted a staff inmate at another institution.[3]

### III. <u>Material Facts</u>

On March 11, 2011, Plaintiff was sentenced to an aggregate 180 month sentence in the United States District Court for the Western District of Washington. ECF No. 41-1 at 11-12. Plaintiff was held at the Federal Detention Center (FDC SeaTac), which is located in Washington, as a pretrial detainee from June 2, 2010, through June 10, 2011, when he was transferred to USP McCreary. ECF No. 41-1 at 17.

On March 22, 2011, while housed at FDC SeaTac, Plaintiff helped restrain an inmate who had broken out the window of an officer's station with an iron. As a result, his unit manager submitted him for a special monetary award of $100. The award paperwork contains no information regarding the other inmate involved in the incident. ECF No. 18-2. Internal BOP databases indicate that the inmate who broke the officer's window was Plaintiff's cellmate at the time and had never been affiliated with any gang. ECF No. 41-1 at 3, ¶ 7.

On July 8, 2011, Plaintiff arrived at USP McCreary, where staff interviewed him at intake with a set series of questions which asked him if he knew of any reason that he should not be placed in general population. He indicated that he did not know of any reason he could not be placed in general population. However, he did indicate that he had assisted an officer while at FDC SeaTac,

---

[3]The Court has been unable to find any declaration by Case Manager Gyurke. The only declarations contained in the file are those of Robert Carrasco, who is a Correctional Services Specialist [ECF No. 41-1] and Andrew Baughman, who is a Correctional Counselor at the Federal Correctional Complex and Hazelton. ECF No. 41-2. However, it is clear that Plaintiff has in his possession the Monetary Special Award Recommendation. It does not identify the inmate who tried to attack the correctional officer, nor does it indicate that said inmate was a member of any gang. ECF No. 18-2.

but did not indicate that the inmate was a gang member, or that he believed he was in any danger from this assistance. ECF No. 41-1 at 23. Therefore, he was placed in general population. Id. at 17.

On September 15, 2011, Plaintiff received a separation assignment from another inmate because the other inmate, not Plaintiff, requested protective custody. During the investigation into the other inmate's safety, Plaintiff had indicated that the inmate was considered to be a "rat" and indicated an intent to assault this inmate if he returned to general population. ECF No. 41-1 at 4, ¶ 9.

On November 11, 2011, while still at USP McCreary, Plaintiff requested protective custody. It was noted that he was vague on the specific reason, but he stated he had gotten into a situation with another inmate. Plaintiff was placed in the Special Housing Unit (SHU) pending an investigation by the Special Investigative Services Office (SIS). During the course of their investigation, SIS discovered that Plaintiff owed debts to several inmates. Additionally, Plaintiff had provided information to SIS on various occasions. Therefore, SIS determined that a credible threat existed to Plaintiff, made him a separatee from five inmates they identified as potential threats, and kept him in the SHU pending his transfer to another institution. Only one of those five inmates was affiliated with the gang, and he was not a member of the Surenos. ECF No. 41-1 at 4, ¶ 10.

On February 7, 2012, plaintiff was transferred to USP Lee. ECF No. 41-1 at 17. On initial intake, he again indicated he could be placed in general population. Under comments, the staff member wrote "[s]tated he helped a c/o [correctional officer] at SeaTac and its following." ECF No. 41-1 at 25. Plaintiff was then placed in general population.

On March 30, 2012, Plaintiff went to the Lieutenant's office and told the Lieutenant that Paia-affiliated inmates and Sureno-affiliated inmates were attempting to get him to finance drug transactions within the institution. Plaintiff further stated that these inmates were working to see his inmate financial accounts to verify that he was able to pursue this venture. Plaintiff stated that he did

not have the funds but had led both groups to believe that he possessed the required funds to finance these transactions. Plaintiff asked if the prison could do anything for him financially and was told they would not assist him in any manner. Plaintiff requested to be placed in the SHU under SIS investigation. Plaintiff was told that he would have to ask for protective custody. Plaintiff indicated that if BOP staff made him go to the yard that he would have to fight as soon as he entered the unit. Plaintiff said "if this happens it will be on you guys." ECF No. 41-1 at 5, ¶ 12. On that same day, Plaintiff was given an incident report for refusing to obey an order and leave the Lieutenant's Office and returned to the compound. He was then placed in the SHU. Id. at ¶ 13.

On July 2, 2012, Plaintiff was interviewed for Protective Custody, and stated that during a previous federal incarceration, he was involved in intervening in a staff assault. Specifically, he alleged stopping a Sureno gang member from assaulting staff at an institution in the Western Region. He stated he had been approached by an inmate who knew about this incident and stated "it was not appreciated that he got involved." Staff then interviewed two inmates who had affiliations with the Surenos, who indicated that although they had not threatened Plaintiff, they could not guarantee he would not be assaulted for his involvement in "an incident in the West Coast that didn't really concern him." Based on the investigation, Plaintiff was assigned a separation status from the Surenos' spokesperson who had approached him and was held him in the SHU until he could be transferred to another facility. ECF No. 41-1 at 5-6, ¶ 14.

On November 20, 2013 Plaintiff was transferred from USP Lee and arrived at USP Hazelton on January 7, 2013. ECF No. 41-1 at 16-17. At his initial intake screening, Plaintiff did not indicate that he could not be placed in general population. Id. at 27. On February 20, 2013, staff observed Plaintiff being attacked by seven other inmates. During the attack, Plaintiff was stabbed in the upper torso area. A subsequent investigation indicated that the attackers had information that Plaintiff had

an award "for saving a Staff Member's life from an attack by a Sureno Gang Member." ECF No. 41-1 at 6, ¶ 16.

At the time of the attack, Plaintiff did not have a CIM[4] assignment of separation from any of the inmates who attacked him. Plaintiff also did not have a CIM assignment of separation, a separation order, an order of protection, or any other current administrative order requiring his separation from the entire Sureno gang. ECF No. 41-1 at 6, § 17.

On February 26, 2013, Plaintiff was transferred to FCI Cumberland, Maryland. ECF No. 41-1 at 16.On December 12, 2013, Plaintiff told the SIS that two other inmates were involved in ordering a hit on a staff member. During the investigation into this allegation, both inmates denied ordering a hit on a staff member, and one of the inmates indicated that he knew Plaintiff from FDC SeaTac. He stated that Plaintiff had recently shown him paperwork showing he had saved the life of an officer at SeaTac, as well as other paperwork from his Central File. After the investigation was complete, SIS determined that Plaintiff concocted the allegations of a staff hit in order to get the two inmates transferred after problems arose between them. He was therefore made a separatee from these two inmates. ECF No. 41-1 at 6.

On February 10, 2014, Plaintiff was transferred from FCI Cumberland to FCC Lompoc, California. ECF No. 41-1 at 16. He arrived at FCC Lompoc on March 31, 2014, but was placed in the SHU on August 20, 2014, because inmates associated with the Surenos were suspicious of Plaintiff. On December 29, 2014 Plaintiff was transferred to FCI El Reno and arrived there on February 23, 2015. ECF No.41-1 at 6.

On November 13, 2015, SIS received information that gang members from the Barrios Aztecas and Aryan Brotherhood of Texas had a meeting with the Native Americans in regard to

---

[4] Central Inmate Monitoring System. See BOP.gov.

Plaintiff owing a large amount of drug debt to several gangs. SIS received information that Plaintiff was to be assaulted for not paying his debts. Following an investigation, it was found that Plaintiff owed money to five different gangs, as well as other groups and independents. As a result, had to be transferred. ECF No. 41-1 at 7. He arrived at Forrest City on February 11, 2016. Id. at 16.

### IV. Standard of Review

**1. Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations

omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**2. Summary Judgment**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. liberty lobby, Inc., 477 U.S. 242, 248 *1986). In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply

show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587 (citation omitted).

V. **Analysis**

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680. Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred.

28 U.S.C. §§ 2674 & 1346(b)(1); Medina v. United States, 259 F.23d 220, 223 (4th Cir. 2001). In West Virginia, in every action for damages resulting from injuries to the plaintiff alleged to have been inflicted by the negligence of the defendant, the plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939). The burden is on the plaintiff to prove these elements by a preponderance of the evidence. Id. at 899; see also Murray v. United States, 215 F.3d 460, 463 (4th Cir. 2000). Therefore, the plaintiff must prove that the "defendant's breach of duty was more likely than not the cause of the injury." Murray at 463 (quoting Hurley v. United States, 923 F.2d 1091, 1094 (4th Cir. 1991); see also Strahin v. Cleavenger, 603 S.E.2d 197 (W.Va. 2004) (stating that "no action for negligence will lie without a duty broken.").

The FTCA includes specific enumerated exceptions in 28 U.S.C. §2680. If an exception applies, the United States may not be sued, and litigation based upon an exempt claim is at an end. Smith v. United States, 507 U.S. 197 (1993); Dalehite, *supra*. Among the exceptions to the FTCA most frequently applied is the "discretionary function." The discretionary function exception precludes governmental liability for "[a]ny claim based upon ... the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984). Congress believed that imposing liability on

12

the government for its employees' discretionary acts "would seriously handicap efficient governmental operations." Id. at 814 (internal citations and quotations omitted).

The United States Supreme Court has announced a two-step test for determining whether the discretionary function exception bars suit against the United States in a given case. First, the Court must consider the nature of the conduct and determine whether it involves "an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991). Government conduct does not involve an element of judgment or choice and is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." Id. at 322 (internal citations and quotations omitted). If the conduct in question involves the exercise of judgment or choice, the second step of the analysis is to determine whether that judgment is grounded in considerations of public policy. "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 323.

With respect to federal prisoners, the Supreme Court has determined that the duty of care owed by the BOP is fixed by 18 U.S.C. §4042, independent of an inconsistent state rule. United States v. Munitz, 280 F. Supp. 542, 546 (S.D.N.Y 1968). Title 18 U.S.C. §4042 defines the duty of care owed to a prisoner as "the exercise of ordinary diligence to keep prisoners safe and free from harm." Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976). However, the BOP's duty towards the protection of prisoners is not the guarantee of "a risk-free environment." See Usher v. United States, 2010 WL 3721385 (E.D. Ky. Sept. 15, 2010).

In West Virginia, negligence is "always determined by assessing whether the actor exercised 'reasonable care' under the facts and circumstance of the case, with reasonable care being that level

of care a person of ordinary prudence would take in like circumstances." Strahin v. Cleavenger, 603 S.E.2d 197, 205 (W.Va. 2004). "A long standing premise of the law of [West Virginia] is that negligence is the violation of the duty of care under the given circumstances. It is not absolute, but is always relative to some circumstances of time, place, manner, or person." Setser v. Browning, 590 S.E.2d 697, 701 (W.Va. 2003). Accordingly, the duty of care owed to an inmate under West Virginia law is consistent with 18 U.S.C. §4042.

Although 18 U.S.C. §4042 sets forth the mandatory duty of care, it does not direct how the duty is fulfilled. See Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997) (finding the statute "sets forth no particular conduct that the BOP personnel should engage in or avoid while fulfilling their duty to protect inmates."). However, under the FTCA, in disputes between prisoners, it is clear that BOP employees could be negligent in their duty to protect prisoners if they "knew or reasonably should have known of a potential problem" between inmates. Parrott v. United States, 536 F.3d 629, 637 (7th Cir. 2008).

As previously noted, Plaintiff argues that on the date he was attacked at USP Hazelton, BOP officials knew or should have known that he faced an unreasonable risk of attack from inmates who were members of Sureno affiliated gangs. In support of his argument that he is entitled to relief under the FTCA, Plaintiff relies on Program Statement 5180.05, Central Inmate Monitoring System.

By its terms, the purpose and scope of this policy statement is as follows:

> The Bureau of Prisons monitors and controls the transfer, temporary release (e.g., on writ), and community activities of certain inmates who present special needs for management. Such inmates, known as central inmate monitoring (CIM) cases, require a higher level of review which may include

Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities. This monitoring is not to preclude a CIM case from such activities, when the inmate is otherwise eligible, but rather is to provide protection to all concerned and to contribute to the safe and orderly operation of federal institutions.

28 C.F.R. § 524.70.

Relevant to this case, CIM cases are classified according to the following assignments:

(d) <u>Disruptive Groups</u>. Inmates who belong to or are closely affiliated with groups (e.g., prison gangs), which have a history of disrupting operations and security in either state or federal penal (which includes correctional and detention facilities) institutions. This assignment also includes those persons who may require separation from a specific disruptive group.

(f) <u>Separation</u>. Inmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future. Factors to consider in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual . . . and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution. This assignment also includes those inmates who have provided authorities with information concerning the unauthorized or illegal activities of others. This assignment may also include inmates from whom there is no identifiable threat, but who are to be separated from others at the request of the Federal Judiciary or U.S. Attorneys.

28 C.F.R. § 524.72.

Other than defining which groups of inmate present "special needs" there is no further guidance on what type of heightened review is required. As this Court has previously noted, the assignment of a separation order is a matter of discretion on the part of BOP officials. <u>Usry v.</u>

United States, 2013 WL 1196650 (N.D. W.Va.).[5] Moreover, nothing in the above-cited policy statement, nor the Code of Federal regulations can be interpreted as requiring separation of an inmate from an entire gang based on past encounters with individual gang members.

Maintaining order and security in prison is the type of policy-based decision that the discretionary function exception shields. See Cohen v. United States, 151 F.3d 1338, 1344 (11th Cir.1998) ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons."); Dykstra v. U.S. Bureau of Prisons, 140 F.3d 791, 796 (8th Cir.1998) ("Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors. These factors upon which prison officials base such decisions are inherently grounded in social, political, and economic policy. We have no difficulty in concluding that the discretionary function exception applies to the correctional officer's decision not to place Dykstra in protective custody or to take other protective action."); Calderon v. United States, 123 F.3d 947, 951 (7th Cir. 1997) ("It is clear that balancing the need to provide inmate security with the rights of the inmates to circulate and socialize within the prison involves considerations based upon public policy.").

Here, there is simply no evidence to support Plaintiff's assertion that BOP officials knew or should have known that he was in danger of attack at USP Hazelton. Both the intake

---

[5] In Usry, the plaintiff argued that the government was negligent in placing him in general population with an inmate from a security threat group, the "Dirty White Boys (DWBs)," because the United States knew that the DWBs posed a threat to him. The United States argued that there was no mandate that the plaintiff had to be separated from all DWBs, and that plaintiff's attacker, although a member of the DWBs, was not a specific separatee from the plaintiff, and therefore, all decisions regarding the placement of the plaintiff and his attacker were discretionary, and fell within the discretionary function exception of the FTCA. This Court agreed and found the government's decision to place the plaintiff and his attacker in the general population fell with the discretionary function exception to the FTCA.

counselor at Hazelton and his case manager deny that Plaintiff told him that he was danger and could not be placed in general population. In addition, there is no evidence that Plaintiff requested protective custody at USP Hazelton prior to the attack, and in fact, Plaintiff makes no allegation that he did. The material facts cited above demonstrate that he was given protective custody when he requested it, investigations were conducted, and he was made a separatee from all individual inmates who were a verifiable threat to his safety.

Finally, when a federal prisoner sues under the FTCA for injuries caused by a fellow inmate, this court and others have uniformly held the action to be barred by the discretionary function exception. See, e.g., Usry v. United States, 2013 U.S. Dist. LEXIS 41420 (N.D. W.Va. 2013) aff'd. Usry v. United States, 2013 U.S. App. LEXIS 22528 (4th Cir. 2013); Donaldson v. United States, 281 Fed. App'x. 75, 76-78 (3rd Cir. 2008) (upholding dismissal of an FTCA claim that federal prison employees failed to protect plaintiff from assault by a fellow prisoner on a finding that the claim was barred by the discretionary function exception); Alfrey v. United States, 276 F.3d 557, 565 (9th Cir. 2002); Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998) (reversing judgment in favor of prisoner who brought an FTCA action for injuries sustained as the result of an attack by another inmate); Dykstra v. United States Bureau of Prisons, 140 F.3d 791 (8th Cir. 1998) (discretionary function exception applied, barring suit for BOP officials' failure to warn plaintiff that his youthful appearance might make him vulnerable to attack, or to place him in protective custody when plaintiff complained that fellow inmate was staring at him); Calderon v. United States, 123 F.3d 947 (7th Cir. 1997) (discretionary function exception applied to FTCA claim for government's failure to protect plaintiff from attack by cellmate); Buchanan v. United States, 915 F.2d 969 (5th Cir. 1990) (discretionary function exception applied to FTCA claim for damages by prisoners held hostage

during a prison uprising); and Graham v. United States, 2002 U.S. Dist. LEXIS 1765 (E.D. Pa. Feb. 5, 2002).

Federal courts have consistently held that because § 4042(a) does not mandate a specific, non-discretionary course of conduct, a plaintiff must either demonstrate that other mandatory directives were violated, or that a BOP employee made a discretionary judgment not grounded in the policy of the regulatory regime, in order to establish subject matter jurisdiction. See, e.g., Calderon, 123 F.3d at 950 (holding that like §4042(a), the regulations within 28 C.F.R. §541 regarding inmate discipline and special housing units also provide general guidance to BOP employees). "Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors. These factors upon which prison officials base such decisions are inherently grounded in social, political, and economic policy." Dykstra v. United States Bureau of Prisons, 140 F.3d 791, 796 (8th Cir. 1998). Because §4042(a) "is an established governmental policy . . . [that] allows a Government agent to exercise discretion" in providing for the safekeeping, protection, and care of inmates, it must be "presumed that the [BOP's] acts are grounded in policy when exercising that discretion." Gaubert, *supra* at 324. Plaintiff bears "the burden of proof to show an unequivocal waiver of sovereign immunity exists and to show that" the discretionary function exception does not apply." LeRose v. United States, 285 F. App'x 93, 96; Welch v. United States, 409 F.3d 646 (4th Cir.2005). Plaintiff has not met this burden.

**VI.** Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that Defendant's Motion to Dismiss or, in the alternative, Motion for Summary Judgment [ECF No. 40] be **GRANTED** and Plaintiff's Complaint be **DISMISSED with prejudice**.

Within **fourteen (14) days** after being served with a copy of this recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985) <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), *cert. denied,* 467 U.S. 1208 (1984).

The Clerk of Court is directed to provide a copy of this Report and Recommendation to Plaintiff by certified mail, return receipt requested, and to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Filing in the United States District Court.

Dated: 9-20-16

*/s Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE